STATE OF CONNECTICUT *v.* JOHN DE SANTIS

COTTER, C. J., LOISELLE, BOGDANSKI, LONGO and PETERS, JS.

Argued May 4—decision released July 31, 1979

*Michael J. Daly III,* for the appellant (defendant).

*Walter H. Scanlon,* chief assistant state's attorney, with whom, on the brief, was *Francis M. McDonald, Jr.,* state's attorney, for the appellee (state).

LOISELLE, J. The defendant John De Santis was charged in a two-count information with assault with intent to commit murder in violation of General Statutes § 53-12 (Rev. to 1969) and with having a dangerous weapon, a firearm, without a proper permit issued therefor, in a motor vehicle, in violation of General Statutes § 29-38 (Rev. to 1969).[1] He was found guilty of the lesser included offense of aggravated assault on the first count and guilty of the second count as charged. This appeal is taken from the judgment rendered on the verdict.

From the evidence presented, the jury could have found, in part, as follows: Samuel Fenn and the defendant John De Santis went to a friend's apartment in Waterbury late in the afternoon on May 16, 1971. While they were there, Anthony Caruso, the victim, along with three of his friends arrived at the apartment. Fenn became involved in an argument with Caruso and Caruso's friends. When Caruso and his friends were asked to leave, they did and went to the Porter Street Restaurant in Waterbury. The argument apparently concerned an alleged threat Fenn made to one of Caruso's friends which was aimed at Caruso among others. The alleged threat was, "If you guys want to bother me and make trouble for me, I'll blow all your heads off." At first, Fenn denied making the threat, but later conceded: "If I said anything like that, I apologize."

---

[1] These alleged crimes were committed prior to the enactment of the present penal code. General Statutes §§ 53a-1—53a-212 (Rev. to 1979).

After the argument at the Waterbury apartment, Fenn drove the defendant to his home where the defendant picked up a gun. Fenn then drove to the Porter Street Restaurant, parked outside and blew the horn. Caruso heard the horn, looked out the window and saw Fenn and the defendant parked in the street. Fenn, who was in the driver's seat, and the defendant, who was in the passenger's seat, motioned for him to come outside. Caruso came outside to the car, followed by three of his friends, two of whom had been with him at the Waterbury apartment. Caruso came over to the passenger's side of the car, where the defendant was seated. Fenn and Caruso, continuing their argument, traded some heated words.

Fenn testified that he thought he saw Caruso go for a gun, so he backed up the car and yelled to the defendant, "Shoot him, shoot him." In response, the defendant picked up the gun that he had concealed, pointed it through the car window and shot Caruso in the shoulder.

Following the shooting, Fenn and the defendant went to Fenn's apartment. From there Fenn's wife drove them to Larry Bellemare's house. The defendant, Fenn, Bellemare and his girl friend then left by car for Cape Cod. On their way, they got lost and ended up traveling to Cape Cod by way of Pittsfield, Massachusetts and Bennington, Vermont. Fenn testified that during the trip the defendant disassembled the gun and threw the parts in a lake near Pittsfield, Massachusetts.

While on Cape Cod, Fenn telephoned Lieutenant Angelo Santoro of the Waterbury police and told him that both he (Fenn) and the defendant were involved in the shooting of Caruso. Fenn and the

defendant left the Cape the next day, May 17, 1971, to return to Connecticut. Fenn dropped the defendant off in Hartford and continued on to Waterbury where he turned himself in to the police. Three or four days later Fenn brought the defendant to the police station.

At trial, the defendant claimed he was driving Fenn's car and that Fenn was in the passenger's seat. He testified that when they were parked outside the Porter Street Restaurant, he heard someone say, "shoot him," at which point he threw the car into reverse. He further testified that Fenn fired from inside the car as he, the defendant, backed the car up the street.[2]

On appeal, the defendant has raised five assignments of error, all of which are related to evidentiary rulings. The defendant first argues that the court erred in excluding his explanation of why he went to the scene of the shooting. He contends that the crime charged, that of assault with intent to murder, requires proof of a specific intent and that the court erred in excluding evidence that went toward negating specific intent. The actual testimony proffered did not relate directly to the defendant's intent, but was a hearsay revelation of specific prior misconduct on the part of the victim and his friends. Words which tend to prove circumstantially the declarant's feelings or state of mind are admissible. *State* v. *Cronin,* 64 Conn. 293, 305–306, 29 A. 536 (1894); McCormick, Evidence (2d Ed.) § 249. The defendant was allowed to testify as to his state of mind;[3] what was excluded was his testimony as to

[2] Additional facts will be referred to where they are pertinent to a discussion of a specific claim of error.

[3] The defendant on cross-examination and redirect examination, moreover, testified as to why he went to Porter Street.

rumors about prior acts of the victim. At the time, although defense counsel took exception to its exclusion, he never claimed that this testimony was admissible for any reason other than that "it goes to his reason for being at Porter Street that evening." See *State* v. *Miller,* 154 Conn. 622, 629, 228 A.2d 136 (1967). The testimony about prior acts of the victim in this case did not fit within any exception to the hearsay rule and thus was properly excluded. Even if it were determined that the court erred, it was harmless error as the jury did not find the defendant guilty of the crime charged, but of the lesser included offense of aggravated assault; *State* v. *Whiteside,* 148 Conn. 208, 217, 169 A.2d 260, cert. denied, 368 U.S. 830, 82 S. Ct. 52, 7 L. Ed. 2d 33 (1961); which does not require specific intent as a necessary element of that crime. *State* v. *Bitting,* 162 Conn. 1, 6, 291 A.2d 240 (1971).

The defendant next asserts that the court erred in striking his answer to a question asked by the prosecution. The testimony in issue centered on the confrontation at the Waterbury apartment. On cross-examination, the defendant stated that he was scared. When asked at what point he was scared, he responded that it was when Fenn told him that Caruso and his gang were involved in a recent murder. The court sustained the state's objection and struck the answer. Previously, the defendant had attempted to put in this evidence and the court had not allowed it. Had the defendant claimed self-defense as the reason for shooting at Caruso, his state of mind would have been relevant. It could very well have been affected by his knowledge that the victim had supposedly been involved recently in a murder. "When a defendant charged with murder asserts that he killed in self-defense, his state of

mind — the existence and reasonableness of apprehension of such violence by the deceased as to justify the defensive measures adopted — becomes material." *State* v. *Padula,* 106 Conn. 454, 456, 138 A. 456 (1927). The evidence also would have been admissible to show who might be the aggressor. *State* v. *Miranda,* 176 Conn. 107, 405 A.2d 622 (1978). In this case, however, the defendant never claimed he acted in self-defense, but rather denied ever shooting at the victim. Whatever the violent character of the victim, it was irrelevant to the defendant's claim that he never shot at Caruso. *State* v. *Townsend,* 167 Conn. 539, 561, 356 A.2d 125 (1975).

The claim now raised by the defendant, that this evidence "would have explained the defendant's actions," was never made to the trial court. "If a defendant . . . wishes to except to a ruling excluding evidence which was objected to only generally, he must avail himself of the provisions of the rule [Practice Book, 1978, § 288] and state his claim of admissibility. . . . Since the defendant failed to state the ground for his claim of admissibility, the ruling cannot be held to be reversible error." *State* v. *Hawkins,* 162 Conn. 514, 515–16, 294 A.2d 584 (1972); *State* v. *Ferraro,* 164 Conn. 103, 107, 318 A.2d 80 (1972); *State* v. *Whiteside,* supra, 217. The court was not in error in striking the testimony.

The defendant next contends that the court erred in refusing to permit the defense to cross-examine the state's witness, Fenn, on a point raised on direct examination. On direct examination Fenn testified that when he thought Caruso was going for a gun, he told the defendant to shoot Caruso. During cross-examination he repeated this testimony. He was

then asked if he knew that Caruso was carrying a gun. He replied, "He has been known to carry a gun." The defense counsel then asked, "How did you know that?" Fenn replied, "By a previous thing he was involved in about a year and a half ago." He was then asked, "Tell us about it." The state objected on the ground that this testimony was not relevant and the court sustained the objection. There was no claim on the part of the defense that any knowledge Fenn had was anything but a rumor. Further, the defense did elicit from Fenn that Caruso had been known to carry a gun. It is obvious that the defense's only purpose was to put before the jury the claim that Caruso somehow was involved in a murder which had occurred about a year and a half before the incident involving the defendant.

The colloquy between defense counsel and the court as to the admissibility of this testimony is lengthy and unclear. The defendant's main claim for the admissibility of Fenn's testimony was that it established that Fenn was aware of Caruso's propensity for violence. See *State* v. *Padula,* supra. At one point, defense counsel stated, "Here we have material information which clearly bears on the case. It is clearly relevant. The state of mind of somebody when he claims to have ordered somebody else to shoot somebody, the reason why he did it, why he knew about that person's reputation for violence, that person's habit of going armed or not armed, are all relevant to what he said and why he said it, and why this thing happened or didn't happen." This statement was made just prior to the court's ruling.

The testimony sought was not evidence of Caruso's violent character or of a violent trait of his but evidence of a specific act. This type of evidence is inad-

missible. *State* v. *Martin,* 170 Conn. 161, 365 A.2d 104 (1976). This court outlined the rationale for the rule that specific acts are inadmissible to prove a character trait in *Richmond* v. *Norwich,* 96 Conn. 582, 597, 115 A. 11 (1921). In *State* v. *Martin,* supra, the rule was reiterated, but this court noted that there was a distinction between direct examination eliciting evidence concerning a character trait and cross-examination on that trait once it was put into evidence by the opposing party. See also *State* v. *Townsend,* supra, 561; cf. *State* v. *Miranda,* supra. The court did not err in excluding this testimony.

The defendant's fourth claim is that the court erred in refusing to permit the defendant to explain why he fled the state after the shooting. The references to the transcript in both briefs reveal that there was an extended explanation given by the defendant, which was in some instances quite detailed. No useful purpose would be served in repeating all of this testimony. The specific ruling relates to the following: Fenn and the defendant had testified as to the events that occurred after the shooting — how they had gone to Cape Cod by way of Vermont. The defendant later testified on his own behalf that on the way back from Cape Cod he had stayed in Hartford while Fenn returned to Waterbury. The defendant was asked why he stayed in Hartford. He replied that he was afraid of a motorcycle club and that Fenn was going to "straighten everything out with the motorcycle club." The claimed error is the sustaining of the state's objection to the next question, "How was he going to do this?" The objection was that the answer would involve "the mental process of somebody else." This type of evidence is hearsay and thus is inadmissible. Wharton, Criminal Evidence (13th

Ed.) § 420. Defense counsel made no claim that it came within an exception to the hearsay rule. He merely asserted that the answer would explain the defendant's action. This testimony is inadmissible for a second reason: it is fundamental that a witness must base his evidence on personal knowledge; *Gray* v. *Mossman,* 91 Conn. 430, 437–38, 99 A. 1062 (1917); *Daily* v. *Spann,* 110 Conn. 312, 313, 147 A. 807 (1929); 2 Wigmore, Evidence (3d Ed.) § 657. It is obvious that whatever knowledge the defendant had was based on Fenn's knowledge of the situation and hence was hearsay. The court was not in error in excluding this evidence.

The defendant's final assignment of error is that the court erred in refusing the defense permission to recall Lieutenant Santoro to establish that Fenn had made a claim or statement to him during his investigation which was contrary to Fenn's testimony at trial. The defendant piggybacks a *Brady* rule violation; *Brady* v. *Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); onto this claim. The testimony in issue concerns a telephone call Fenn made to Lieutenant Santoro from Cape Cod the day after the shooting. It is difficult to consider this claimed error in that the excerpts of testimony in the defendant's brief appear to be connected and chronological while in fact they are not. The defendant indicates that one excerpt can be found at certain pages of the transcript, while actually there is a gap of over five hundred pages of testimony between the pages indicated in the brief and the location of the excerpt. The defendant included no narrative in his brief about any of the testimony that occurred between the cited excerpts to aid this court in its determination of the issue presented, and he did not indicate which excerpts preceded or followed

each other. Further, the issue is presented in such a way that it is unclear whether the defendant is claiming that the court erred in not allowing further cross-examination of Lieutenant Santoro to attack the credibility of Fenn, or whether he is contending that he was deprived of his due process rights because the prosecution did not reveal to him supposedly exculpatory information. The supposedly exculpatory evidence was a report concerning a statement Fenn made to the police.

Lieutenant Santoro first testified on a Thursday. During this testimony he stated that Fenn called him at about 2 p.m. on May 17, 1971. The defendant's counsel objected to Santoro testifying about any conversation between himself and Fenn. Santoro also testified that Fenn came into the police station that evening and again the defendant's counsel objected to any testimony about his conversation with Fenn. Both objections were sustained. During the course of Santoro's testimony, counsel for both the state and the defense referred to the fact that Santoro was refreshing his memory from notes. Thus, it is undisputable that defense counsel, at the very least, knew of the report and could have examined it after direct examination.

On the next Thursday, Santoro testified in rebuttal for the state concerning the credibility of the defendant's wife. On cross-examination, defense counsel asked for Santoro's notes. Defense counsel realized that he had them when the state's attorney stated, "I think we gave them to you." It is not clear when defense counsel received the notes. It was either immediately after Santoro had first testified a week earlier, as is customary, or sometime during the

intervening week. It is clear, however, that defense counsel had these notes prior to Santoro taking the stand the second time, a week later.

After two other witnesses for the state had testified, defendant's counsel moved to cross-examine Santoro on the basis that Santoro's notes recited the fact that Fenn had called him on May 17, and stated that "on the night in question, Freddie Caruso had a gun and pulled it on Porter Street." The claim was made that this statement was both exculpatory and contradicted Fenn's previous trial testimony that he did not see Caruso with a gun but "thought he was reaching for a gun." The nature of the colloquy between counsel and the court makes it clear that the court denied the motion on the basis that the defense had had ample opportunity for cross-examination on this issue on both occasions that Santoro testified because he had used the notes in question in his testimony. Further, defense counsel stated that he did not mind putting into evidence all of Santoro's testimony about the statement that Fenn made over the phone. No objection was made by the state and no offer was made to put the statement in as an exhibit or to read the statement into evidence.

"[C]ross-examination as to the contents of a document and questions at least relating to, if not actually involving, the contents of the document should not be permitted unless the writing is in evidence." *Robinson* v. *Faulkner,* 163 Conn. 365, 373, 306 A.2d 857 (1972) ; *Shulman* v. *Shulman,* 150 Conn. 651, 662, 193 A.2d 525 (1963). That aside, a trial court has wide discretion as to the scope of cross-examination. *State* v. *Grasso,* 172 Conn. 298, 303,

374 A.2d 239 (1977); *State* v. *Palozie,* 165 Conn. 288, 297, 334 A.2d 468 (1973). The transcript of Santoro's testimony, which was examined in its entirety by this court, indicates that defense counsel had ample opportunity to cross-examine Santoro "and it is this right which forms the core of the confrontation clause." *State* v. *Burns,* 173 Conn. 317, 324, 377 A.2d 1082 (1977); *California* v. *Green,* 399 U.S. 149, 90 S. Ct. 1930, 26 L. Ed. 2d 489 (1970). This is especially true in view of the fact that the first time Santoro testified the defense objected to the state's attempt to offer the very evidence he now claims should have been allowed. It is apparent that the report was available at that time. It is also probable that defense counsel had it in his possession after the direct examination of the witness. *Neff* v. *Neff,* 96 Conn. 273, 278–79, 114 A. 126 (1921).

Further, even assuming arguendo that the ruling of the court was not within its discretion as discussed above, the exclusion of that facet of the evidence could not have affected the verdict. *United States* v. *Agurs,* 427 U.S. 97, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976). It must be kept in mind that it is the issue of Fenn's credibility that is the crux of this claimed error. The defendant did not raise self-defense as an issue. Nowhere is it claimed that Fenn told the defendant that he thought Caruso was pulling a gun or in fact was pulling a gun. Nowhere is it claimed by the defendant that if Fenn had been allowed to testify that he had seen Caruso pulling a gun at the time, the verdict in this case would have been different. In view of the extensive cross-examination of Fenn, the testimony of other witnesses that the defendant shot Caruso, and the defendant's defense that Fenn was the one who shot Caruso, Santoro's testimony about the discrepancy

between the telephone conversation and Fenn's trial testimony would not have changed the result in this case.

The second prong of the defendant's claim is that, somehow, the refusal of the court to allow the cross-examination violated his right to due process as enunciated in *Brady* v. *Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); and *Giles* v. *Maryland,* 386 U.S. 66, 87 S. Ct. 793, 17 L. Ed. 2d 737 (1967). *Brady* involved the discovery by the defense, after trial, of exculpatory information which had been known to the prosecution but unknown to the defense. In the present case, defense counsel had the notes during the trial. It is not clear when he received them, but he did have them at the time of the state's rebuttal. Whether the court would have extended the right of the defense to question Fenn on his conversation with Santoro after the state's rebuttal is unknown. See *Clark* v. *George B. Wuestefeld Co.,* 132 Conn. 653, 658, 46 A.2d 841 (1946). It is in this context of uncertainty about whether the information could have been used that the issue is reviewed.

The defense did not specifically request this information as was done in *Brady.* It only asked for *any* exculpatory information. Santoro's report stated that Fenn had called and said that Caruso pulled a gun from his belt. In view of the fact that the defendant did not claim that he acted in self-defense this information was not so obviously exculpatory as to give notice to the prosecution that it should turn over the statement to the defense. Where there is a general request for exculpatory matter, and there is no obvious exculpatory character to information in the prosecution's possession, the issue is

decided as if no request was made. *United States* v. *Agurs,* 427 U.S. 97, 107, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976). The issue is whether the materiality of the information is such as to impose a duty upon the prosecution on its own accord to turn that information over to the defense. In *Moore* v. *Illinois,* 408 U.S. 786, 795, 92 S. Ct. 2562, 33 L. Ed. 2d 706 (1972), it was noted that there is "no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case." "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States* v. *Agurs,* supra, 109–110. The test for materiality is laid down in *Agurs* (pp. 112–13) as follows: "[I]f the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt."

Reviewing the entire record, it is indisputable that Santoro's statement that Fenn told him that Caruso pulled a gun, if put into evidence, in contrast to the testimony of Fenn that he thought Caruso was pulling a gun, would not have affected the jury verdict of guilty. The court was not in error in its ruling.

There is no error.

In this opinion the other judges concurred.